CITY OF TOLEDO, Plaintiff,

v.

BEAZER MATERIALS AND SERVICES, INC., Successor-in-Interest to Koppers Company, Inc.; Toledo Coke Corporation; The Interlake Corporation, Successor-in-Interest to Interlake, Inc.; The Interlake Companies, Inc., Successor-in-Interest to Interlake, Inc. and Acme Steel Company, Successor-in-Interest to Interlake, Inc., Defendants.

No. 90–CV–7344.

United States District Court,
N.D. Ohio,
Western Division.

Feb. 14, 1996.

**1014**

John D. Scouten, City of Toledo, Department of Law, Toledo, OH, Stephen P. Calardo, Kevin Bragg, D. David Altman, Altman & Calardo, Cincinnati, OH, for plaintiff City of Toledo.

Kenneth R. Bruce, "Albee" Bates, Babst, Calland, Clements & Zomnir, Pittsburgh, PA, for defendant Beazer East, Inc.

Paul W. Schroeder, Suzanne S. Greene, Jones, Day, Reavis & Pogue, Chicago, IL, for defendants The Interlake Corporation & Acme Steel Company.

WILLIAM K. THOMAS, Senior District Judge.

### INTERLAKE'S CROSS–MOTION FOR CONTRIBUTION
### MEMORANDUM AND ORDER

The Interlake defendants have filed their cross-motion for summary judgment against the City and Toledo Coke for contribution:

> If this Court grants summary judgment against them, defendants, The Interlake Corporation, The Interlake Companies, Inc., and Acme Steel Company (collectively, the "Interlake Defendants"), move this Court, pursuant to Fed.R.Civ.P.Rule 56, to enter summary judgment against plaintiff City of Toledo and co-defendant Toledo Coke Corporation for contribution under 42 U.S.C. § 9613(f) for any necessary costs of response incurred consistent with the

National Contingency Plan, for which the Interlake Defendants are found to be liable pursuant to 42 U.S.C. § 9607(a).

Interlake's Cross–Mot. at 1–2.

Plaintiff City of Toledo has filed a "Memorandum in Opposition to Interlake's Cross–Motion for Summary Judgment on Interlake's Claim for Contribution Under Section 9613(f) of CERCLA" (hereafter City's Opposition to Cross–Motion). Thereafter, the Interlake defendants filed their reply memorandum "In Support Of Their Cross–Motion For Summary Judgment Against The City And Toledo Coke"[1] (hereafter Interlake's Reply). Because of the "if come" nature of Interlake's cross-motion, the organization of this Memorandum and Order will be to match the City's points of opposition to Interlake's reply.

### I. (A)

■   Plaintiff City argues:

Under *Redwing Carriers [Inc. v. Saraland Apartments, Ltd.]* [875 F.Supp. 1545, 1555–56 (S.D.Ala.1995)], summary judgment must be denied, however, even if the Court ultimately concludes that a genuine issue of material fact exists as to either the City's ownership *or* the City's operation of the facility. *Id.*

City's Opp'n to Cross–Mot. at 2.

City quotes *Redwing Carriers:*

> "Under [Section] 9607(a)(1), a person must be both a current owner *and* current operator of a facility ... to be liable [under the subsection of CERCLA]."[1]

---

[1] In contrast, under section 9607(a)(2), a person who either owned *or* operated a facility at the time of disposal (such as Interlake) can be held liable under CERCLA. *See* 42 U.S.C. § 9607(a)(2). As the Court in *Redwing Carriers* noted:

> When the two [subsections] are read together, there can be no doubt that § 9607(a)(2) refers to a legal person who is both the owner and opera-

---

1. In Footnote No. 1 of its Reply, Interlake defendant bullets:

   This Court has already found, in its August 29, 1995 "Interlake's Motion for Clarification Memorandum and Order" (the "August 29, 1995 Order"), that Toledo Coke is a potentially responsible party under Section 107(a) of CERCLA. (at 16–17.) In that same August 29,

1995 Order, the Court directed the Interlake Defendants "to file a representation of facts and law to support [a potentially responsible party] claim against the City." (*id.,* at 25.) This Reply Memorandum is intended to constitute such a representation.

Interlake's Reply at 2.

tor, while § 9607(a)(2) imposes liability regardless of whether a person was both owner and operator. There is nothing "unclear" or "ambiguous" about the word "and;" it is conjunctive.

*Redwing Carriers* 875 F.Supp. at 1556.

*Id.*

The Interlake Defendants counter:

The City's current ownership of the ROW is enough to create liability under CERCLA. The City attempts to avoid this result by citing a single district court case from the Eleventh Circuit for the proposition that a person must be both a current owner *and* a current operator in order to incur CERCLA liability. *Redwing Carriers, Inc. v. Saraland Apts., Ltd.*, 875 F.Supp. 1545, 1555–56 (S.D.Ala. 1995). As the City must know, however, *Redwing Carriers* is contrary both to binding Sixth Circuit precedent and the universal interpretation of Section 107(a)(1), which holds that any current owner *or* operator is liable.[3] *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 997 (6th Cir.1993) (interpreting statute in disjunctive and holding defendant liable as current owner). *See also, United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 n. 3 (11th Cir.1990) ("Although the 'owner and operator' language of § 9607(a)(1) is in the conjunctive, we construe this language in the disjunctive in accordance with the legislative history of CERCLA and the persuasive interpretations of other federal courts."), *cert. denied*, 498 U.S. 1046 [111 S.Ct. 752, 112 L.Ed.2d 772] (1991); . . .

---

[3] One commentator notes that "the 'owner and operator' language in CERCLA § 107(a)(1) invariably has been construed to read 'owner *or* operator.'" ALFRED R. LIGHT, CERCLA LAW AND PROCEDURE 29 (1992) (emphasis in original).

Interlake's Reply at 5.

In *AM Int'l, Inc. v. International Forging Equip. Corp.*, the Sixth Circuit holds in pertinent part:

Section 107(a) defines the following as liable parties: (1) owners and operators of a facility at the time of its cleanup; (2) owners and operators of the facility at the time of disposal; (3) generators of waste who arranged for disposal; and (4) transporters who selected the site for disposal. 42 U.S.C. § 9607(a)(1)–(4).

*AM Int'l*, 982 F.2d at 997.

*United States v. Summit Equipment & Supplies, Inc.*, 805 F.Supp. 1422 (N.D.Ohio 1992), is cited by plaintiff for another reason. However, as to the present point, Judge Aldrich of this court ruled:

[T]here are four (4) categories of potentially responsible parties who are liable under CERCLA § 107(a) for the costs incurred when the government responds to a release, or a threatened release, of hazardous substances:

. . . .

(2) any person who at the time of disposal of any hazardous substance owned *or* operated any facility at which such hazardous substances were disposed of, (Emphasis added).

*Summit*, 805 F.Supp. at 1428.

Thus, like the Sixth Circuit in *AM Int'l, Inc.*, Judge Aldrich of this Northern District of Ohio construes the words of Section 107(a)(1–2) in the disjunctive. This court adopts this disjunctive construction. The plaintiff's reliance on *Redwing Carriers'* literal conjunctive reading of Section 107(a)(1) "owner *and* operator of a facility" is respectfully rejected. By its purchase of the Right-of-Way, the City became the current owner. As the current owner of the Right-of-Way, the City falls within category 2 of the "four (4) categories of potentially responsible parties who are liable under CERCLA § 107(a)," *United States v. Summit Equipment & Supplies, Inc.*, 805 F.Supp. 1422, 1428, *supra.*

## I. (B)

▇▇▇ City of Toledo seeks to negate its titled ownership of the Right-of-Way by now asserting its Sixth Cause of Action (Fraudulent Conveyance), ¶¶ 52–66, of the First Amended Complaint. In part, City of Toledo asserts:

54. A deed was delivered to the plaintiffs on May 9, 1988, and recorded in the office of the recorder of Lucas County, Ohio. A copy of this deed is attached hereto as Exhibit B.

55. After the City had purchased the property, it discovered high levels of benzene and other hazardous substances present in the subsurface soils and groundwater at and about the right-of-way property.

56. During the negotiations for the sale of the right-of-way property, the defendant failed to inform the City of the benzene and other subsurface soil and groundwater contamination on the property despite its knowledge of past spills of benzene and releases of hazardous substances at and about the right-of-way property, and its knowledge of other releases of chemical substances at the Site.

57. The benzene and other subsurface soil and groundwater contamination is not readily observable and constitutes a latent defect in the property which the defendant had a duty to disclose to the City.

. . . .

63. The defendant's failure to inform the City of the presence of contamination constitutes fraudulent misrepresentation through a material omission on the part of the defendant.

First Am.Compl. at 17–18.

In paragraph (e) of *"RELIEF REQUEST-ED"* of the First Amended Complaint, plaintiff City asks that "the Court issue an order rescinding the sale of the right-of-way property to the City and ordering the return of the sale price of $227,690.00 . . ." (First Am. Compl. at 20).

Defendant Interlake notes:

The City had ample opportunity to seek judgment on its claim for recision against Toledo Coke, a litigant not currently represented by counsel, but never did so. Nor has the City bothered to present, by way of affidavit, any facts supporting its fraudulent conveyance theory. Consequently, the Court must rule on the Interlake Defendants' Cross–Motion for Summary Judgment in light of the current status of the City as the present owner and operator of the ROW—not some hypothetical status.

Interlake's Reply at 8.

The City has failed to submit any facts to support the fraudulent conveyance theory.

More than that, the City, in the permanent injunction hearing, introduced evidence that shows the City engaged in open and notorious ownership of the Right-of-Way. This clear evidence is now reviewed.

Bernard J. Leite, Director of Public Service for the City of Toledo, testified:

Q. And did MEC ... undertake environmental testing in the right-of-way adjacent to the Toledo Coke property on behalf of the City of Toledo?

A. Yes.

Q. Mr. Leite, I am going to hand you what has been marked as Plaintiff's Exhibit 49, which is a two volume exhibit, and I will ask you to take a look at that document, and tell me if you recognize it, sir.

A. Yes.

Q. What is that document, sir?

A. It is the document that reports on their observations and findings in the Front Street right-of-way area at Toledo Coke in the Norfolk and Western Railroad right-of-way.

Q. And that is dated July of 1988; is that correct?

A. That's correct.

Q. And do you recall, sir, in general, what the recommendations were that were made by MEC as a result of the work that they undertook?

A. To first off put a fence around a specific area of Front Street.

Q. What specific area?

A. The vicinity of the diked area that is shown in that drawing, top drawing on the easel.

. . . .

Q. Was the fence constructed?

A. Yes.

Q. Okay. And when was that constructed if you recall?

A. I don't recall the exact date, but I know it was done as quickly as possible after we knew of the recommendation and the reason for it.

Tr. at 1479–81.

By erecting a fence to bar persons from the Right-of-Way, which it had purchased from

Toledo Coke, the City openly and notoriously announced that it was asserting ownership rights over the fenced-off area. Actually, the City's erection of the chain link fence on the Maumee River side of East Front Street barred persons from all of the Right-of-Way. Further demonstrating its Right-of-Way ownership, the City engaged OH Materials (OHM) which installed additional soil borings and monitoring wells. OHM issued a 1989 Report, plaintiff's Exhibit 50. The Report included a "recommendation ... not to proceed." This was

> Because of the contamination that existed there was of such a nature that there would be danger to the workers and the need to remediate before that project should be undertaken.
>
> Tr. at 1484.

OHM conducted further testing in the area of the Front Street Right-of-Way and on the Toledo Coke property. Further manifesting its ownership rights in the Right-of-Way, Mr. Leite, for the City of Toledo, wrote a letter dated January 31, 1994 "to various companies and the Ohio Utilities Public Service advising that there is chemical contamination in the immediate vicinity of Toledo Coke, and that they should recognize this in conjunction with any underground activities that may take place." Tr. at 1496. This "immediate vicinity of Toledo Coke" included the purchased Right-of-Way containing the benzene contamination.

The City has moved for summary judgment for its payments to MEC and OHM for environmental services performed on the Right-of-Way. In a ruling, filed on January 22, 1996, this court has granted the City's motion. The City's motion and this court's granting of summary judgment pursuant thereto is antithetical to the City's further asserting its Sixth Count, which asserts that the Toledo Coke deed of the Right-of-Way is a fraudulent conveyance. The court concludes, as Interlake asserts, that the City has waived its Sixth Count claim of fraudulent conveyance, or is estopped from pursuing this claim.

### I. (C)

City of Toledo argues that a genuine issue of material fact exists "As To Whether The City Currently 'Operates' The Facility At Issue In This Case." It says that Interlake is required:

> to show that the City "had *authority to prevent the contamination of the property.*" *Donahey v. Bogle*, 987 F.2d 1250, 1254 (6th Cir.1993) (Emphasis added); *U.S. v. Summit Equip. & Supplies, Inc.*, 805 F.Supp. 1422, 1430 (N.D.Ohio 1992).
>
> City's Opp'n to Cross–Mot. at 3.

City relies on this *Donahey* language:

> The evidence clearly established that Livingstone had the authority to prevent the contamination of the property by his corporation; thus, as a matter of law, Livingstone was a responsible party. *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532 (W.D.Mich.1989).
>
> *Donahey* at 1254.

*Donahey* does not relate to a definition of "operator" in CERCLA § 107(a) for two reasons. *Donahey* is defining "responsible party," not "operator." *Secondly, Donahey's* quotation relates to *Livingstone's* "authority" within the Thomas Solvent Corporation, not relevant to the City's status as an "operator" of the Right-of-Way. *Donahey's* citation of *Kelley v. Thomas Solvent Co.* becomes understandable in light of this *Thomas Solvent Co.* quote:

> [8] The standard I have articulated is quite unlike the lack of corporate formalities associated with piercing the corporate veil, and is different from the issue of personal knowledge, direct supervision, or active participation found in most ordinary torts by corporate actors. *Here the focus on the inquiry is whether the corporate individual could have prevented the hazardous waste discharge at issue* (emphasis added).
>
> 727 F.Supp. at 1544.

In support of this quoted language the *Thomas Solvent Co.* Court develops the "prevention test" in a corporate setting from which *Donahey* extracts its quoted wording:

> This Court will look to evidence of an individual's authority to control, among other things, waste handling practices— evidence such as whether the individual

holds the position of officer or director, especially where there is a co-existing management position; distribution of power within the corporation, including position in the corporate hierarchy and percentage of shares owned. Weighed along with the power factor will be evidence of responsibility undertaken for waste disposal practices, including evidence of responsibility undertaken and neglected, as well as affirmative attempts to prevent unlawful hazardous waste disposal. Besides responsibility neglected, it is important to look at the positive efforts of one who took clear measures to avoid or abate the hazardous waste damage. Therefore the Court will look to this evidence when determining liability by the "prevention" test.

*Id.* at 1543–1544.

District Judge Enslen then distinguishes his "prevention test" from the prohibition against piercing the corporate veil.

Thus power or authority will be analyzed, a factor not used in the traditional standards for tortious conduct by corporate individuals. Secondly, the Court, in determining individual liability under § 107, will look at responsibility undertaken for waste disposal practices as it relates to the prevention test.

*Id.* at 1544.

Thus, *Kelley v. Thomas Solvent Co.'s* "prevention test," underlying *Donahey*, does not help define the CERCLA § 107(a)(1) term "operator ... of a ... facility" nor the § 107(a)(2) term "any person who ... operated any facility."

Moving on to CERCLA's definitions of "operator," definitional Section 101(20)(A) provides no help. *FMC Corp. v. U.S. Dept. of Commerce*, 29 F.3d 833, 843 (3rd Cir.1994) holds:

The definition of "operator" in CERCLA gives little guidance to the courts in determining if a particular person or entity is liable as an operator because the statute circularly defines "operator" as "any person ... operating such facility." 42 U.S.C. § 9601(20)(A)(ii). Fortunately, however, the case law provides us with criteria for identifying those who qualify as "operators" under CERCLA.

*FMC Corp.,* 29 F.3d at 843.

Continuing,

[5, 6] We start our discussion of whether the government was an operator by considering our opinion in *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209. [ (3rd Cir.1993) ] In that case, we adopted the "actual control" test in determining whether operator liability should be imposed on one corporation for the acts of a related corporation. The actual control test imposes liability which would not be consistent with "traditional rules of limited liability for corporations" but nevertheless is consistent "with CERCLA's broad remedial purposes, most importantly its essential purpose of making those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *Id.* at 1221 (internal quotation marks omitted). Under this test, a corporation will be liable for the environmental violations of another corporation if there is evidence that it exercised "substantial control" over the other corporation. *Id.* At a minimum, substantial control requires "active involvement in the activities" of the other corporation. *Id.* at 1222. While *Lansford–Coaldale* arose in the context of related corporations, it is nevertheless instructive here.

*Id.* at 843.

Accepting this Third Circuit language as reasonable construction of "operator," the "actual control" test will be applied in determining whether the owner of a facility is also its "operator." Does the City have "actual control" of the facility within the Right-of-Way? is the question to be answered. It is true, as the City urges, that "all of the active disposal or placement of the benzene and other hazardous substances occurred before the City acquired the ROW property." (City's Opp'n to Cross–Mot. at 9.) Once the City acquired the Right-of-Way, it is also true:

When the City suspected the Site may be contaminated, it promptly investigated, notified the proper environmental agencies of the presence of the contamination, and

erected a fence and took other precautions to secure the Site. *See* Leite T.p. at 1478, 1480–85; 1496; P–115; Neise T.p. at 470. City's Opp'n to Cross–Mot. at 7.

Nevertheless, it is presently true that the City has "actual control" of the facility within the Right-of-Way (including the area of benzene contamination). Hence, it is concluded that the City is the "operator" as well as the "owner" of the Right-of-Way. Such status subjects the City to liability or potential liability under CERCLA Section 107(a) unless the City has established its affirmative defense under the next part.

## I. (D)

City further argues:

EVEN IF THE CITY IS AN "OWNER AND OPERATOR" UNDER SECTION 9607(A)(1), GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER THE CITY IS AN "INNOCENT LANDOWNER" UNDER CERCLA, 42 U.S.C. § 9607(B).

. . . .

CERCLA provides the following "innocent landowner" defense:

> There shall be *no liability* under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting there from were caused solely by
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (3) the act or omission of a third party other than an employee or agent of the defendant, or one whose act or omission occurs in connection with *a contractual relationship,* existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published

tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precaution against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3).

For the purposes of this section, CERCLA defines "contractual relationship" to *exclude:*

> real property on which the facility concerned is located was acquired by the defendant *after* the disposal or placement of the hazardous substance on, in, or at the facility, and ... *the defendant is a government entity which acquired the facility ... through the exercise of eminent domain authority by purchase or condemnation.*

42 U.S.C. § 9601(35)(A)(ii) (Emphasis added).

City's Opp'n to Cross–Mot. at 4–5.

In construing the "innocent landowner" defense, based on the claimed exercise of eminent domain authority, pursuant to § 9607(b)(3), § 9601(35)(A) defines the term "contractual relationship" found in § 9607(b)(3). In the present case, the City is a defendant in Interlake's cross-motion for summary judgment. To establish its "innocent landowner" defense, the defendant, City has the burden by a preponderance of the evidence, of proving several elements of § 9607(b)(3) and § 9601(35)(A) including (ii) but not (i)[2]. Since only proof of (ii) is here

---

**2.** The City does not base its "innocent landowner" defense on § 9601(35)(A)(i) which reads:

> At the time the defendant acquired the facility, the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release of threatened release was disposed of on, in, or at the facility.

The City makes this clear in note 3 of its "Opposition to Interlake's Cross–Motion" at page 6:

> Interlake erroneously states that "the City did no environmental due diligence prior to its purchasing the ROW, [thus] the City has no defense to its liability under CERCLA." Interlake Response p. 23. On the face of CERCLA, however, the "due diligence" requirement only

at issue, the court does not consider nor decide whether the City has proved the other elements of the City's affirmative defense.

Section (35)(A)(ii), which the City must prove, states:

> (ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.

The City expounds its Section 35(A)(ii) eminent domain argument:

> This Court has held that in acquiring the contaminated ROW property, the City exercised its power of eminent domain:
>
> > The absence of a state court adjudication that the City lawfully exercised its power of eminent domain is not dispositive. The significant point is that the City asserted its eminent domain power. Toledo Coke accession to the City's demand, in this Court's mind, was a concession that the City was lawfully exercising its eminent domain power. This sufficiently establishes that the City's purchase of the Toledo Coke's [sic] property for the widening of Front Street is for a public purpose.
>
> June 14 Order p. 6 (quoting Mem. and Order of March 15, 1994 at 14).

City's Opp'n to Cross–Mot. at 5.

Highlighting its March 15, 1994 holding, affirmed on June 14, 1994, the court first recognized that there had not been "a state court adjudication that the City lawfully exercised its power of eminent domain." Secondly, this court distinguished the City's lawful exercise of its power of eminent domain from its "assert[ion of] its eminent domain power." Finally, this court held that the City's assertion of its eminent domain power "sufficiently establishes that the City's purchase of the Toledo Coke's property for the widening of Front Street is for a public purpose."

This court now considers the question whether the "absence of a state court adjudication that the City lawfully exercised its power of eminent domain" has an effect on the City's assertion of the "innocent landowner" eminent domain defense. Attention is turned to the essential provisions of Ohio's "Chapter 163: Appropriation of Property."

█ O.R.C. 163.04 and 163.05 provide how an agency (here the City) "lawfully exercise[s] its power of eminent domain." Section 163.04 states:

> Appropriations shall be made only after the agency is unable to agree, for any reason, with the owner, or if more than one, any owner, or his guardian or trustee, or when any owner is incapable of contracting in person or by agent and has no guardian or trustee, or is unknown, or is not a resident of this state, or his residence is unknown to the agency and cannot with reasonable diligence be ascertained.

Thus, the agency (here the City) must first negotiate with the landowner for the purchase of the property. Next, the agency and the landowner must be unable to agree. In the present case there was negotiation between the City and Toledo Coke. But, they were able to agree. Toledo Coke sold the Right-of-Way parcel to the City.

Only if the parties had been unable to agree would the City have been empowered to exercise its power of eminent domain under O.R.C. Sec. 163.05. In sufficient part, that Section reads:

§ 163.05 Petition for appropriation.

> An agency which has met the requirements of section 163.04 of the Revised Code, may commence proceedings in a proper court by filing a petition for appropriation of each parcel or contiguous parcels in a single common ownership, or interest or right therein. The petition of a private agency shall be verified as in a civil action and all petitions shall contain:
>
> (A) A description of each parcel of land or interest or right therein sought to be

applies to defenses asserted under subparagraph (i).... As the court in *Peterson [Petersen] Sand & Gravel* correctly recognized, "due diligence" is irrelevant under subparagraph (ii) (the subparagraph at issue here) when a gov-ernmental entity, such as the City, acquires the contaminated site through its eminent domain power. *See Peterson [Petersen] Sand & Gravel,* 806 F.Supp. [1346] at 1357–58 [ (N.D.Ill. 1992) ].

appropriated, such as will permit ready identification of the land involved;

Significantly, Section 163.05 begins:

An agency which has met the requirements of section 163.04 of the Revised Code, may commence proceedings in a proper court....

Since it was unnecessary for the City to exercise this authority and take this step, it is evident that the City did not obtain the Right-of-Way by resorting to its statutory power of eminent domain. While the City is a "government entity," it did not acquire the facility "through the exercise of eminent domain by purchase or condemnation," pursuant to Section 9601(35)(A)(ii). While the City did "purchase" the property, this does not constitute "appropriation" under O.R.C. Section 163.05.

## II. (A)

In part III of its Reply Memorandum, Interlake examines several cases under the heading "The City Is Liable For Contribution Of An Equitable Share Of Any CERCLA Liability Imposed On The Interlake Defendants." Interlake chiefly relies on *United States v. Northernaire Plating Co.,* 670 F.Supp. 742, 748 (W.D.Mich.1987), *aff'd, United States v. R.W. Meyer, Inc.* 932 F.2d 568 (6th Cir.1991). United States (the government), brought a CERCLA action against Weaver (the landowner), Northernaire (the operator of electroplating facility) and Garwood (its principal owner and sole shareholder). The government sought to recover costs expended in undertaking "Immediate Removal Action" under CERCLA, Section 107, 42 U.S.C., Section 9607. The defendants filed a third-party claim against City of Cadillac, Michigan for contribution and/or indemnification.

For present purposes, the court considers only the District Court's ruling on the government's summary judgment motion, and the Court of Appeals' review of that ruling, to the extent that these rulings assist in understanding CERCLA Section 113(f), 42 U.S.C. Section 9613(f).

The district court found, insofar as pertinent:

Northernaire leased the facility from Meyer. This contractual relationship precludes either of these defendants from invoking the protections of Section 9607(b)(3) by arguing that the other defendant is the third party which was the cause of the release (citations omitted). Meyer also argues that "the facts as they ultimately develop may show that Garwood was solely responsible for the alleged 'release' or that Garwood and the City of Cadillac together were responsible, and that Northernaire in and of itself had no responsibility" (citation omitted). Meyer fails to provide any support for this hypothesis. Garwood was the president of Northernaire. The hazardous substances found at the site are all associated with electroplating, the business which Northernaire was engaged in. It is inconceivable that Garwood, acting outside of his role as president and an agent of Northernaire, caused the release of hazardous substances at the site or created the threatened release which prompted the EPA to engage in an "Immediate Removal Action." Meyer cannot create an issue of fact by relying on "conclusory and supported allegations, rooted in speculation...." *Bryant v. Commonwealth of Kentucky,* 490 F.2d 1273, 1274 (6th Cir. 1974).

*U.S. v. Northernaire,* 670 F.Supp. at 748.

Continuing,

The government has sought the imposition of joint and several liability in this matter. While Section 9607 permits the imposition of joint and several liability, it does not require it. *United States v. A & F Materials Co.,* 578 F.Supp. 1249 (S.D.Ill. 1984). Whether or not joint and several liability is to be imposed turns on whether or not the harm is divisible, *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 811 (S.D.Ohio 1983). "If the harm is divisible and if there is a reasonable basis for apportionment of damages, each defendant is liable only for the portion of the harm he himself caused." *Id.* However, if the harm is indivisible then each defendant who is found liable is subject to liability for the entire harm.

*Id.*

Judge Hillman then ruled:

> I find that the harm in this matter is indivisible. While the basis for each of the defendant's liability is different, Meyer is liable because it is the landowner, Northernaire is liable because it is the operator, and Garwood is liable because of his role in directing the handling of hazardous substances at Northernaire, the source of the harm is the same. The source of the harm was the presence of the hazardous substances at the Northernaire facility. The presence of the substances at the Northernaire site is directly attributable to the activities of Garwood and Northernaire. Therefore, it could be argued that they alone are responsible for causing the entire harm. This is, however, contrary to the plain language of the statute which makes a landowner strictly liable absent his ability to assert a defense under Section 9607(b)(3). Congress clearly intended that the landowner is considered to have "caused" part of the harm. As such, the harm is indivisible, and all of the defendants are jointly and severally liable.[3]
>
> *Id.*

In its *United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 748 (W.D.Mich. 1987) quote, Interlake seizes this language of Judge Hillman ("Congress clearly intended that the landowner be considered to have 'caused' part of the harm.") (Interlake's Reply at 16.) This quote should be considered in the context that he had previously found that Northernaire:

> began operations in Cadillac in 1972 under a ten-year lease on property owned by Meyer. These operations continued until mid–1981 when Northernaire's assets were sold to Toplocker Enterprises, Incorporated ("Toplocker").

*Northernaire*, 670 F.Supp. at 744.

Thus, at the time the hazardous substances were deposited on the land, Meyer was the landowner. In contrast, in the present case, the *City of Toledo* was not the landowner at the time the contaminating benzene and other hazardous substances were deposited on the land that makes up the Right-of-Way. This is not to say that the City's acquisition of the land after Interlake contaminated the ground can operate to deny liability to the City under CERCLA Section 107(a), 42 U.S.C. § 9607(a). However, it is essential to determine whether the City's belated acquisition of the Right-of-Way may be considered in applying CERCLA Section 113(f), 42 U.S.C. Sec. 9613(f), under which Interlake seeks contribution. Section 113(f) provides, in pertinent part:

> (1) *Contribution*
>
> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

On Meyer's appeal, the caption of the case changed to *United States of America, Plaintiff v. R.W. Meyer, Inc., Defendant/Third Party, Plaintiff–Appellant, Northernaire Plating Company, Willard S. Garwood, Defendants/Third Party, Plaintiffs–Appellees, City of Cadillac, Third Party Defendant, Fourth Party Plaintiff.* In affirming the District Court, the Sixth Circuit (one judge concurring) thus summed up this "contribution action."

> Because the relative fault of parties to a contribution action will depend upon the factual circumstances, Meyer's claim must be reviewed by examining whether the equitable considerations employed by the trial court, when applied to the facts of this case, support the conclusion that the court properly exercised its discretion.

---

**3.** Judge Hillman then states:
*See, U.S. v. South Carolina Recycling and Disposal, Inc.*, [653 F.Supp. 984] 20 Env't. Rep. Cases (BNA) 1753, 1759 (S.C.D.C.1984) (holding landowners and generators jointly and severally liable under CERCLA).
This case is discussed *infra* at 1023.

Contribution actions among parties held jointly and severally liable under CERCLA often involve complex factual scenarios associated with multi-party liability and necessarily require courts to perform a case-by-case evaluation when allocating the cost for clean-up of hazardous waste. Under the facts of this case, it cannot be said that the court improperly balanced the equitable factors relevant to resolving contribution claims under CERCLA.

*R.W. Meyer, Inc.*, 932 F.2d at 578.

Thus, the Sixth Circuit construes CERCLA Section 113(f) to require the "trial court," in "employ[ing]" "equitable considerations," to "properly exercise[ ] its discretion." Significantly, the Sixth Circuit does not *impose* on "the trial court," in exercising the CERCLA Section 113(f) discretionary duty, to consider or apply CERCLA Section 107(a). The Sixth Circuit construes Section 113(f) as presenting a factual question. Thus the Court says only that:

Contribution actions among parties held jointly and severally liable under CERCLA often involve complex factual scenarios associated with multi-party liability and necessarily require courts to perform a case-by-case evaluation when allocating the cost for clean-up of hazardous waste.

*Id.*

In exercising the "trial court"'s discretion under this Sixth Circuit direction, this court, in applying CERCLA Section 113(f), will consider as a principal fact, that the City of Toledo was not the landowner at the time the contaminating benzene and other hazardous substances were deposited onto the land which constitutes the Right-of-Way.

## II. (B)

This court is bound to apply as precedent the foregoing Sixth Circuit ruling and language in *U.S. v. R.W. Meyer, Inc.* Notwithstanding, this court examines a case cited by the City as well as two cited by Interlake. Plaintiff cites *U.S. v. Rohm and Haas Co.*, 2 F.3d 1265, 1280 (3rd Cir.1993). There, the Third Circuit held, and the City quotes the underlined words:

[10] CP's second suggested factor— that most, if not all, of the hazardous substances found on the property were disposed of there by R & H and R & H—DVI—comes closer to warranting apportionment. Indeed, if CP were able to prove that none of the hazardous substances found at the site were fairly attributable to it, <u>we might well conclude that apportionment was appropriate and CP's apportioned share would be zero</u> (emphasis added).

*Rohm and Haas Co.*, 2 F.3d at 1280.

The Court later noted:

*See* 42 U.S.C. § 9613(f) (1988) (authorizing private contribution actions and permitting courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate"); [*U.S. v. Alcan Aluminum [Corp.]*, 964 F.2d [252] at 270 n. 29. [ (3rd Cir.1992) ] No contribution claim is currently before us, however. It follows … that the government is entitled to recover under § 107.

*Id.* at 1281.

This construction of CERCLA Section 113(f) is correct, as this court understands this section. It supports the Third Circuit's earlier conclusion that "CP's apportioned share would be zero."

In its Reply Memorandum, Interlake cites a Fourth Circuit case:

*United States v. South Carolina Recycling & Disposal, Inc.*, 653 F.Supp. 984, 993 (D.S.C.1984) (ownership of a site was sufficient to fix liability and rejecting contention that Congress did not intend to subject 'innocent' landowners to CERCLA liability), *aff'd*, *United States v. Monsanto Co.*, 858 F.2d 160, 166–68 (4th Cir.1988) (plain language of CERCLA extends liability to owners of facilities, regardless of their degree of participation in the disposal of hazardous wastes), *cert. denied*, 490 U.S. 1106 [109 S.Ct. 3156, 104 L.Ed.2d 1019] (1989).

Interlake's Reply at 16.

Interlake's parenthetic paraphrasing of the D. South Carolina 1984 decision will be compared to that decision. In principal part, District Judge Simons ruled as to the "landowners:"

## B. *Liability of the Landowners*

[7] Under Section 107(a)(2) of CERCLA, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of" and at which there has been a release or threatened release of hazardous substances, is liable for response costs incurred at the site. 42 U.S.C. § 9607(a)(2). The landowners Hutchinson and Seidenberg do not dispute their ownership of the Bluff Road property or that hazardous substances were disposed on the property during their period of ownership. They also have not disputed that there were releases and threatened releases of hazardous substances at the site which caused the incurrence of response costs. Consequently, there are no material issues with respect to these defendants' liability.

*South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. at 993.

Unlike the belated City of Toledo's ownership of the contaminated land,

> The landowners Hutchinson and Seidenberg do not dispute their ownership of the Bluff Road property or that hazardous substances were disposed on the property during their period of ownership.

*Id.*

The only language of Judge Simons that Interlake's *South Carolina Recycling and Disposal, Inc.,* cite might refer to is this follow-up language:

> [8] In this connection, the court notes that after the summary judgment hearing, the landowners sought to amend their Answer, which the court permitted with plaintiff's consent. The landowners urge that their Answer, as amended, raises disputed issues of fact concerning the affirmative defense to liability provided by 42 U.S.C. § 9607(b)(3). The court does not agree that the amended Answer and the landowners' affidavits raise such genuine issues of fact. The § 9607(b)(3) defense would require the landowners to prove *inter alia* that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused *solely* by ... (3) an act or omission of a third party

other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly with the defendant...." (emphasis added). Because there is no question of the contractual link between the landowners and SCRDI, whose liability is admitted, the landowners cannot under any circumstances prove that the release was caused "solely" by a third party which did not share a contractual relationship with them. Thus, because the § 9607(b)(3) defense is unavailable to them from the outset, the landowners cannot rely on disputed factual issues concerning its other requirements to bar the summary judgment against them.

*Id.*

This court concludes that the above language and ruling of District Judge Simons does not warrant Interlake's paraphrase of his decision. Nor does the cited language of the Fourth circuit in affirming Judge Simon sustain Interlake's paraphrasing. In pertinent part, the Fourth Circuit held:

## A. *Site Owners' Liability*

[1, 2] In light of the strict liability imposed by section 107(a), we cannot agree with the site-owners contention that they are not within the class of owners Congress intended to hold liable. The traditional elements of tort culpability on which the site-owners rely simply are absent from the statute. The plain language of section 107(a)(2) extends liability to owners of waste facilities regardless of their degree of participation in the subsequent disposal of hazardous waste.

Under section 107(a)(2), *any* person who owned a facility at a time when hazardous substances were deposited there may be held liable for all costs of removal or remedial action if a release or threatened release of a hazardous substance occurs. The site-owners do not dispute their ownership of the Bluff Road facility, or the fact that releases occurred there during their period of ownership. Under these circumstances, all the prerequisites to section 107(a) liability have been satisfied. [Footnotes 12 and 13 omitted]

*U.S. v. Monsanto Co.,* 858 F.2d 160, 168 (1988).

Interlake further cites a U.S. Southern District of Florida case, which, like the instant case, is a CERCLA action between parties that do not include the United States Government. Interlake contends:

Landowners are liable in a contribution action under CERCLA for their equitable share of necessary costs of response incurred consistent with the NCP, even if they did not physically contribute to the hazardous substance releases at the property. *South Florida Water Management Dist. v. Montalvo,* No. 88–8038–CIV–DAVIS, 1989 WL 260215, at *2 (S.D.Fla. Feb. 15, 1989) (landowner has CERCLA liability even though it is not the source of contamination);

Interlake's Reply at 15–16.

The relevant portion of *Montalvo* is set forth:

The issue is complicated in this case because it would appear that the harm is divisible. The parties have stipulated that the sole source of the toxic pesticides was Defendants' business. NEW FARM is not the source of any of the contaminants at the site. That fact, however, does not absolve NEW FARM. In the few cases that have dealt with this issue, landowners have been found jointly and severally liable under CERCLA even though they did not physically contribute to the contamination. *United States v. Monsanto Co.,* 858 F.2d at 171 n. 22; *United States v. South–Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 995 ( [D.] S.C.1986 [1984] ); *United States Northernaire Plating Company,* 670 F.Supp. 742, 748 (W.D.Mich. 1987). The Northernaire opinion is particularly instructive.

*Montalvo,* No. 88–8038–CIV–DAVIS, 1989 WL 260215, at *2.

After summarizing the *Northernaire* opinion [not repeated because this court has quoted Northernaire at length, *supra* ], the District Court held:

This Court adopts this reasoning and finds each of the Defendants and NEW FARM jointly and severally liable.

*Id.*

Since *Montalvo* adopts the reasoning of *Northernaire,* and this court has applied *Northernaire*'s appellate ruling in *U.S. v. R.W. Meyer, Inc., supra,* it is manifest that the *Montalvo* language quoted by Interlake adds nothing to the present analysis. However, *Montalvo*'s application of CERCLA Section 113(f) at 2–4, shows that a trial court has wide discretion in recognizing "Equity demands," in allocating response costs among parties.

## II. (C)

Interlake states that its Cross–Motion for Summary Judgment does

not seek the assignment of a specific equitable portion of CERCLA liability to the City. As a result, the issue raised by the City is not before the Court. In addition, a decision on equitable allocation is premature until the universe of responsible parties is fixed. The Court's decision on the Interlake Defendants' motion for clarification indicates that Beazer may have CERCLA liability, but no motions to impose this liability are pending. As this Court has already recognized (see August 29, 1995 Order, at 17–18), additional proceedings are necessary before a specific equitable share can be assigned to each potentially responsible party, but the City's share certainly should be more than zero.

Interlake's Reply at 16.

Therefore, Interlake thereafter requests that:

in the event this Court grants the City's Motion for Summary Judgment [which this court has done], the Court also grant the Interlake Defendants' Cross–Motion and enter judgment against the City and Toledo Coke under Section 113(f) of CERCLA for contribution to any necessary costs of response incurred consistent with the NCP, subject to further proceedings to establish equitable allocations for all of the responsible parties.

*Id.* at 18–19.

As for the Cross–Motion against the City, this court enters judgment for contribution subject to further proceedings to establish equitable allocations for all of the respon-

sible parties. Interlake says that "the City's share certainly should be more than zero." While reserving the final setting of the City's percentage to the appropriate later hearing, this court has indicated herein that pursuant to the Sixth Circuit ruling *U.S. v. R.W. Meyer, Inc., supra,* and applying CERCLA Section 113(f) to the facts so far developed and found in this case, these facts would warrant setting the City's share at zero.

In Interlake's Cross–Motion for Summary Judgment against Toledo Coke, Interlake observes "Toledo Coke did not file any response or opposition to the Cross–Motion." (Interlake's Reply at 18.) This is correct. Interlake then says:

Toledo Coke is clearly the current owner and operator of property adjacent to the ROW which constitutes part of the facility. *Id.*

This is also correct. This court agrees and determines that Toledo Coke is liable under Section 107(a)(1) and is a responsible party which may share in the court's allocation of response costs under CERCLA Section 113(f).

IT IS SO ORDERED.